AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

|  |  |
|---|---|
| United States of America | **FILED**<br>CLERK, U.S. DISTRICT COURT<br><br>October 13, 2024<br><br>CENTRAL DISTRICT OF CALIFORNIA<br>BY: _____ ts _____ DEPUTY |
| v. | |
| SAULO BISMARK TUGAVAO SOE, | Case No.   2:24-mj-06288-DUTY |
| Defendant. | |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of October 11, 2024, in the county of Los Angeles in the Central District of California, the defendants violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 841(a)(1): | Possession with Intent to Distribute a Controlled Substance |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*Complainant's signature*

Adam Parada, HSI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    October 13, 2024 at 10:20 a.m.

_____
*Judge's signature*

City and state:   Los Angeles, California

Hon. Stephanie Christensen, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: Alexander H. Tran x0758

**AFFIDAVIT**

I, Adam Parada, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint and arrest warrant against Saulo Bismark TUGAVAO SOE for a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute Methamphetamine.

2.    This affidavit is also made in support of an application for a search warrant for a digital device (the "SUBJECT DEVICE"), in the custody of Homeland Security Investigations, in Los Angeles, California, as described in Attachment A: one rose gold iPhone, IMEI number 353914101166978, seized from TUGAVAO SOE's person during his arrest.

3.    The requested search warrant seeks authorization to seize evidence, fruits, and instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute a controlled substance) 21 U.S.C. § 953(a) (unlawful exportation of controlled substances), 21 U.S.C. § 960 (knowing exportation of a controlled substance), 18 U.S.C. § 554 (knowing exportation of any merchandise contrary to any law), and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and

witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.    I am a Special Agent ("SA") with Homeland Security Investigations ("HSI") and have been so employed since November 2021.  My duties involve conducting and participating in criminal investigations of individuals and businesses for possible criminal violations of Titles 8, 18, 19, and 21 of the United States Code.  I earned a Bachelor's Degree in Criminal Justice with a minor in Homeland Security from Marymount California University.  Before my employment with HSI, I worked for the United States Secret Service, Uniformed Division for four years where I received a United States Secret Service Valor Award.  I received continuous and extensive training.  My duties consisted of patrolling areas within the District of Columbia and providing presidential protection.

6.    In March 2023, I graduated from the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia.  During this training program, I completed approximately 350 hours of instruction, including classes involving the study of constitutional law, search and seizure, surveillance, and a variety of other law

enforcement related classes.  In June 2023, I graduated from the Homeland Security Investigations Special Agent Training program at the Federal Law Enforcement Training Center in Glynco, Georgia.  During this training, I completed approximately 350 hours of training in the following subject matter areas: immigration law, customs laws, money laundering, search and investigative techniques, human trafficking and human smuggling, contraband investigations, and other program areas for which HSI bears responsibility.

7.    During the course of my employment with HSI, I have participated in multiple investigations that involve drug and weapons trafficking.  Through my training, experience, and interaction with other law enforcement officers, I am familiar with the methods employed by individuals involved in drug trafficking and how they use digital devices to facilitate and conceal their crimes.

### III.  **SUMMARY OF PROBABLE CAUSE**

8.    On October 11, 2024, at approximately 9:09 p.m., TUGAVAO SOE arrived in Los Angeles Airport ("LAX") from Toronto Pearson International Airport ("YYZ") with a duffel bag and a gray suitcase in checked luggage, and attempted to fly from LAX to Melbourne Airport in Australia ("MEL").  During a secondary border screening of TUGAVAO SOE's luggage, United States Customs and Border Protection Officers ("CBPOs") scanned TUGAVAO SOE's checked luggage and detected multiple large metallic bags that contained rock-type substances.

9.    CBPOs scanned the gray suitcase through an x-ray, which revealed anomalies within the bag.  Upon further inspection by CBPO Ventrice, the gray suitcase contained six large silver metallic sealed bags with rock-type substances and no other items.  Upon opening the silver metallic sealed bags, CBPO Ventrice discovered seventeen Ziplock bags containing a white, crystalline substance.  The white, crystalline substance field tested positive for methamphetamine.  CBP subsequently seized approximately 17 kilograms (37.87 pounds) of suspected methamphetamine.

10.   During the CBP examination, TUGAVAO SOE claimed ownership of both the duffel bag and gray suitcase.[1]  CBPO Ventrice discovered the tickets for TUGAVAO SOE'S flight from Toronto to LAX, and from LAX to Melbourne, Australia.  CBPOs were able confirm that the bag tags on the checked luggage matched with the baggage receipts on TUGAVAO SOE's boarding pass.  The checked baggage receipts also contained the name "SOE SAULO" (i.e., TUGAOVO SOE's first name and half of his last name).  At the time of his arrest, TUGAVAO SOE had the SUBJECT DEVICE in his possession.

IV. **STATEMENT OF PROBABLE CAUSE**

11.   On October 11, 2024, TUGAVAO SOE attempted to travel from Toronto International Airport to LAX to Melbourne Airport in Australia via Air Canada.  The initial leg of his trip was on

_____

[1] TUGAOVO SOE later disclaimed ownership of the checked luggage.

Air Canada flight AC793 from YZZ to LAX, which landed at LAX at approximately 9:09 p.m.

12.  Based on my conversations with CBPOs, my personal participation in this investigation, my own observations, and my discussions with other federal and local law enforcement officers, I know the following:

### A.    CBP Received a Tip from The Australia Border Force

13.  On October 11, 2024, U.S. CBP at LAX received a tip from the Australian Border Force ("ABF") regarding TUGAVAO SOE. ABF informed CBP that, among other things, TUGAVAO SOE was flagged due to his suspicious flight itinerary.  Specifically, TUGAVAO SOE was a first-time traveler to Canada and paid for his flight ticket to Canada in cash on the date of travel.  TUGAVAO SOE's itinerary consisted of twelve days in Canada, and a flight from Brisbane, Australia to San Fransico and then to Toronto, Canada.  TUGAVAO SOE's return flight to Australia consisted of a flight from Toronto to LAX then to Melbourne.

### B.    CBP Seized 17 Kilograms of Suspected Methamphetamine from TUGAVAO SOE's Checked Luggage

14.  On October 11, 2024, at approximately 11:47 p.m., I received a call from CBP at LAX.  CBP stated that they had conducted an inspection of TUGAVAO SOE following the tip they received from ABF.

15.  According to CBP, CBP pulled TUGAVAO SOE's two checked bags (a duffel bag and gray suitcase) off the Air Canada plane destined for Melbourne while TUGAVAO SOE was in the process of reaching his connecting flight at LAX.  CBP inspected

the gray suitcase and detected multiple large metallic bags containing rock-type substances.

16.    CBP contacted TUGAVAO SOE at the jetway while he was attempting to board Air Canada flight UA098 (LAX to MEL). TUGAVAO SOE had already scanned his boarding pass to board the flight and was walking through the jet bridge.    TUGAVAO SOE stated he had two checked bags, and that his bags contained clothing and perfumes.    TUGAVAO SOE was escorted to secondary border screening for further inspection.

17.    Upon arrival at the secondary border screening, CBP conducted its routine screening process.    During the secondary border screening, the checked baggage was placed in front of TUGAVAO SOE where he could see the bags.    TUGAVAO SOE verbally confirmed that the checked baggage (duffel bag and gray suitcase) belonged to him.

18.    CBP searched TUGAVAO SOE and found TUGAVAO SOE's flight ticket and boarding pass.    CBP confirmed that the checked baggage belonged to TUGAVAO SOE by comparing the bag tags on the checked luggage with the baggage receipts on TUGAVAO SOE's boarding pass.    Specifically, TUGAVAO SOE had a duffel bag with Air Canada bag tag #804403 and a gray suitcase with bag tag #804404.    Both bag tags contained the name "SOE SAULO" (i.e., TUGAOVO SOE's first name and half of his last name).    TUGAOVO SOE later disclaimed ownership of the checked luggage.

 

19.   When the gray suitcase was opened, a strong vinegar-type odor was present, and six large silver metallic sealed bags were packaged within, as depicted below:

 

20.  CBP opened the six metallic bags, which contained large transparent plastic bags covered in a layer of wet red paste.  Inside the plastic bags were several clear Ziplock bags containing a white, crystalline substance.  According to CBP, the red substance on the plastic bags was likely a technique used to mask the odor to avoid detection from K-9 narcotic dogs. CBP discovered seventeen Ziplock bags in total.

21.  At approximately 11:40 p.m., CBP tested the white, crystalline substance using a NIK Kit U, which tested positive for methamphetamine.  An additional test was done using the Gemini Thermo Analyzer, which also tested positive for methamphetamine.  Pictures of the internal plastic bags are below:

 

22.   TUGAVAO SOE's duffel bag contained miscellaneous clothing and perfumes.  The gray suitcase only contained the silver metallic bags.

23.   In total, CBP subsequently seized approximately 17 kilograms (37.87 pounds) of suspected methamphetamine.

**C.    Law Enforcement Attempted to Interview TUGAVAO SOE**

24.   After CBP seized the suspected methamphetamine, I responded to LAX to examine the evidence and interview TUGAVAO SOE.  On October 12, 2024, at approximately 1:30 a.m., Chief CBP A. Yuan and I advised TUGAVAO SOE of his Miranda rights. TUGAVAO SOE invoked his right to an attorney, and we subsequently terminated the interview.

25.   After the interview, I detained TUGAVAO SOE's passport, flight documents, and I seized the SUBJECT DEVICE, which was on TUGAVAO SOE's person at the time of his arrest.

## V.  TRAINING AND EXPERIENCE ON DRUG OFFENSES

26.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.  Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.  Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

c.  Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or

10

others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

e.    Individuals engaged in the illegal purchase or sale of drugs and other contraband often use multiple digital devices.

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

27.  As used herein, the term "digital device" includes the SUBJECT DEVICE.

28.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary

directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously

12

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

29. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

30. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. <u>CONCLUSION</u>

31. For all of the reasons described above, I submit that there is probable cause to believe that TUGAVAO SOE has committed a violation of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances). I further submit that there is also probable cause to believe that the items to

13

be seized described in Attachment B will be found in a search of
the SUBJECT DEVICE described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 13 th day of
October 2024.


_____
HON. STEPHANIE S. CHRISTENSEN
UNITED STATES MAGISTRATE JUDGE

14